## GRIFFING v. GISLASON et al.

Under the express provisions of Rev. Civ. Code, § 1023, subd. 2, the subsequent marriage of a testator operates as a revocation of his will as a matter of law where the wife is neither mentioned in the will, nor otherwise provided for.

Rev. Civ. Code §§ 1195, 1207, provide that apparent consent to a

contract is not real or free when obtained through mistake, including mistake of law arising from a similar misapprehension of the law by all parties or a mistake by one party of which the others are aware at the time of contracting, but which they do not rectify. Sections 1283, 1285, declare that a party to a contract may rescind if the consent of the party rescinding or of any party jointly contracting with him was given by mistake, provided he acts promptly on discovering the facts, etc. Held, that where a widow was clearly mistaken as to her legal rights in her husband's estate at the time she signed an agreement with the other distributees to accept one-sixth of the estate, and such other distributees appeared at the time to have understood that the widow was entitled to one-third of her husband's property, she was entitled to rescind such agreement, she having acted immediately on ascertaining her rights before any change had occurred in the situation of the parties.

(Opinion filed, Nov. 16, 1906.)

Appeal from Circuit Court, Deuel County. Hon. George H. Marquis, Judge.

Action by Flora A. Griffing against Effie C. Gislason and others. From a judgment for plaintiff, defendants appeal. Affirmed.

*T. J. Law* and *Hall, Lawrence & Roddle,* for appellants.

Where a contract is sought to be avoided on the ground of surprise or mistake, the fact of such surprise or mistake must be either conceded or so clearly established as to be substantially without dispute. Masterson v. Beers, 1 Sweeny, 418; Beazie v. Williams, 49 U. S. 8 How 157; Lyman v. United Ins. Co., 2 Johns. ch. 632; McDonnell v. Mulholland, 48 Md. 545; Pennell v. Wilson, 2 Abb. Pr. N. S. 466; Adair v. Adair, 38 Ga. 49; Arnold v. Fowler, 44 Ala. 168. In order to render valid the compromise of a claim, it is not essential that the matter should be really in doubt. It is sufficient if the parties consider it so far doubtful as to make it the subject of a compromise. 6 Ency. Law, 2nd Ed., 713. To settle or avoid litigation is an object of value. In general terms, the compromise, fairly obtained, of a right at the time doubtful, constitutes a valuable consideration, whatever a subsequent enlightenment may reveal concerning its validity. The value consists in the release from an uncertain position with its anxieties, from apparent danger, and from inevitable expenses and trouble. Bishop on Contracts, § 57; 26 Ency. Law, 26. The law favors family settlements. Shelly v. Brooks, 72 N. W. 37; 12 Ency. Law, 875-

6-7. A compromise of a bona fide controversy is a good considera-
tion. McGlynn v. Scott, 58 N. W. 560; Fryar v. Cetnor, 72 N. W.
909. DeMars v. Musser-Sauntry L. L. & M. Co. 35 N. W. 1.

Hanten & Loucks, for respondents.

The subsequent marriage of a testator operates as a revoca-
tion of his will, as a matter of law, where the wife is neither men-
tioned in the will, nor otherwise provided for. Rev. Civ. Code, §
1023; In re Larson's estate, 18 S. D. 335; In re Corker's estate, 25
Pac. 922. Wherever a person is ignorant or mistaken with re-
spect to his own antecedent or existing private legal rights, either
of property, contract or personal status, and enters into some trans-
action, the legal scope and operation of which he correctly appre-
hends and understands, equity will grant its relief, defensive or af-
firmative, treating the mistake as analogous, if not identical with,
a mistake of fact. 2 Pomeroy, 1175. Guide v. Reynolds, 35 Minn.
331; Conn. Mutual Ins. Co. v. Stewart, 95 Ind. 591. If a party
knows or ought to know that his claim is unfounded, then its set-
tlement will furnish no consideration for the promise, made by the
other party. Kercheval v. Doty, 31 Wis. 479; Pitkin v. Noyes,
48 N. H. 294; McKinley v. Watkins, 13 Ill. 140; Headley v.
Hackley, 50 Mich. 43, 14 N. W. R. 693; Ormsbee v. Howe, 54
Vt. 182; Feeter v. Weber, 78 N. Y. 334; McGlynn v. Scott, 4 N.
D. 18, 58 N. W. R. 460.

FULLER, P. J. The undisputed evidence received at the trial
of this action to rescind a contract on the ground of mistake and
want of consideration is in substance as follows: On the 29th day
of March, 1892, Dennison J. Griffing, a widower and the father of
the defendants, made his last will, bequeathing and devising all his
property in equal shares to them and to any of his children that
might be born subsequently. On the following day he married
the plaintiff who is in no manner mentioned in the will, and for
whom no provision was ever made by marriage contract or other-
wise. On the 13th day of January, 1905, the testator died leaving,
as adult survivors, the parties to this action and a minor son, War-
ren J. Griffing, issue of the marriage above mentioned. In the
early part of the day immediately following the obsequies, the clerk
of courts, George L. Almond, produced the will at plaintiff's place

of residence, and read the same in presence of all the parties inter-
ested.   That plaintiff had not been provided for appeared to be a
matter of universal surprise and the testimony, though controverted
in some particulars, must be regarded sufficient to sustain the find-
ing that Mr. Almond stated at such meeting of the parties that
the will was invalid, and that the property to which the widow
could succeed was the homestead and $750, but nothing more.
The defendants expressed the belief that it was the intention of
their father that plaintiff, as his surviving wife, should share in the
estate amounting to $20,000 equally with them and with the minor
son, Warren J. Griffing, who at the time of his father's demise was
about 11 years of age.   Being well acquainted with Mr. Almond
and wholly ignorant of her rights as the surviving wife, plaintiff
reposed full confidence in his statements and believing that one-
sixth of the property was better for her than the homestead and
$750, she consented to the proposition expressed in the following
contract, which, according to her testimony, was executed so hur-
riedly that she was unable to consider anything about it: "We, the
undersigned, Effie C. Gislason, formerly Effie C. Griffing, Lulah J.
Stevens, formerly Lulah J. Griffing, Milton D. Griffing, Birdie B.
Griffing, and Warren J. Griffing, minor by Flora A. Griffing his
legal guardian; waive all rights under the will of Denison J. Grif-
fing and agree that his widow, Flora A. Griffing, shall share and
share alike with the other heirs of Dennison J. Griffing.   Said Flora
A. Griffing agrees to accept said share with the other heirs as her
full interest in said estate."   The foregoing instrument dated Jan-
uary 16, 1905, was signed and duly acknowledged by all the parties.
interested except the minor son Warren J. Griffing for whom there
was no one qualified to act.

Concluding her redirect and cross-examination plaintiff testi-
fied as follows: "I did not intend to waive my right of exemptions
when I signed this contract.   I first found that I could have a third
interest in the estate outside of the homestead and exemptions when
I went to Watertown.   I saw Mr. Hanten at Watertown.   This
was the next Wednesday after I signed the agreement, a week af-
ter.   Q. Was it the same day that you made out the notice of your
intention to withdraw your consent to that instrument?   A. Yes,

sir; that is the same day I found out what my rights were. I had no information other than that I have stated Mr. Almond told me before I signed that agreement as to what my rights were. I believe he said the will was not good, and that it would be broken. When Mr. Almond made the statement that the will was no good and could be broken I believed that his statement was true. I took him at his word. At the time I signed this agreement I did not understand that I had any rights in his estate as the surviving wife as the will read. I had been told that the will was not good, was invalid, and then Mr. Almond said all I could have was the homestead and $750. No one at the time of signing the agreement or before had told me otherwise. At the time I signed this agreement I considered that I was getting more than the clerk had told me I was entitled to, that one-sixth would be more. At the time I signed this agreement I did not understand that I would have one-sixth of the estate and also the homestead and $750—just the one-sixth. That is all I considered I was going to get under the agreement."

The well-corroborated testimony of Mrs. Schaller is as follows: "I reside at Watertown, S. D., and am a sister of Mrs. Griffing. I was present on the day that Exhibit A was signed. I was at the house when that conversation was had. The five children of Mr. Griffing, Mr. Stevens, Mr. Gislason and Mr. Almond were also present. The way myself and the others came to be present was this: Mr. Almond came first and said he had brought the will, and wanted the children there. Sister said the children weren't there, but that she would send for them. He says, 'Why they told me they would all be here at around 11 o'clock to hear the will read.' There is no telephone in the house, so she sent Warren, and presently they came up there. After the will was read, my sister did not say anything for some time. She seemed just paralyzed. She did not seem to be able to speak, and no one spoke until Mrs. Gislason said—she first asked in regard to heirs, and then Mr. Almond said, 'This will is no good, it is subject to break,' and then she says, 'I don't think father meant that Flora should have nothing. I think he meant she should have an equal share with the rest of us,' and Milton spoke up and said, 'Yes, Flora should have something.' He

would be willing—and said, 'Yes, Flora, we are willing you should share with us,' and then the other two girls said so, too, afterwards. My sister did not make any answer at all, and then Mr. Almond spoke up and said, 'I suppose you know this will is subject to break,' and Flora asked him if it was subject to break what would be her share, and he said, 'You can have $750 and your homestead,' and then—well, then they all rose to go because it was just dinner time, and they all went out into the dining room except Mr. Almond, who was near the door, and Flora said, 'You mean all I can have is my homestead and $750 out of this,' and he said, 'Yes, that is all you can have,' and Flora looked at me and said, 'Isn't that dreadful?' and I said one-sixth is better than that. It was then suggested that she talk to the children in the dining room, and said if they were willing she should have the one-sixth she would rather have it in writing, and then they said they would meet at Holden's Bank after dinner, so after dinner we went down town, and I said to Flora, 'It does not seem to me that you understood Mr. Almond right.' I said, 'I know that is what he said because he said it to us twice, but let's go and see Mr. Almond.' We had known Mr. Almond ever since we had been in Dakota, and he had always been a very good friend of ours, and I had perfect confidence in Mr. Almond, and he has been clerk of courts for so many years, and I felt whatever he said was right, and he ought to know so he could tell, and we went to find him, and we could not find him, and we went to the bank, and he was there, and just a little while after the children came, and the agreement was drawn up."

On plaintiff's behalf Warren J. Griffing testified that he was present during all the conversation at the house, and that Mr. Almond told his mother that the homestead and $750 was all that she could have, and that nothing was said about her being entitled to one-third of his father's estate. The defendants corroborated Mr. Almond to the effect that immediately after the will was read in their presence he told them all that it might be broken for the reason that the widow had not been provided for; that, in addition to the homestead and $750, she would be entitled to one-third of the property in case the will was set aside, and that the agreement was entered into for the purpose of avoiding litigation. While the tes-

timony shows that plaintiff was suffering great mental anguish which tended to impair her ability to fully realize what was said and done, the evidence is considered sufficient to sustain all material findings of fact, and it is very plain that none of the parties exactly knew her legal rights, or that the marriage of the testator operated to revoke the will as a matter of law. In re Larson's Estate, 18 S. D. 335, 100 N. W. 738; Corker v. Corker, 87 Cal. 643, 25 Pac. 922. The undisputed evidence shows that plaintiff received nothing in the way of money or property as consideration for her promise to accept less than half the amount to which she was legally entitled, and, unless affected by the agreement, her status and defendant's, with reference to the property, had not changed prior to the commencement of this action, the determination of which concerns other parties not at all. By adopting a provision of the California statute, the general rule that marriage of the testator unqualifiedly revokes all previous wills has been modified in this jurisdiction as follows: "If, after having made a will, the testator marries and has issue of such marriage, born either in his lifetime or after his death, and the wife or issue survive him, the will is revoked unless provision has been made for such issue by some settlement, or unless such issue are provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of such revocation can be received. (2) If, after making a will, the testator marries, and the wife survives the testator, the will is revoked, unless provision has been made for her by marriage contract, or unless she is provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of revocation must be received." Section 1023, Rev. Civ. Code. The first clause above quoted, was originally taken from the common law, and is a copy of section 567 of the "Civil Code" prepared for the State of New York by David Dudley Field. Under such provision the marriage of a man subsequent to the execution of his will was not of itself sufficient in law to operate as a revocation thereof, unless he had issue by such marriage, but in that event marriage and the birth of issue revoked the will although the husband survived the wife.

1 Redfield on Wills, p. 293; Cassaday on Wills, § 230; Bowers v. Bowers, 53 Ind. 430. By subdivision 2 of the above-quoted section the effect of the subsequent marriage of a man on his previously executed will is pronounced to be revocation, as a matter of law, where the wife is neither mentioned in the will nor provided for by marriage contract, and such is this case precisely.

In answer to the contention that the contract in suit is wholly without consideration, counsel for defendants maintain that the compromise of prospective litigation between relatives is a good and sufficient consideration, and numerous cases are cited in their brief to the effect that the settlement of a doubtful claim is highly favored in equity when made with full understanding of existing conditions. Although it is convincingly demonstrated that plaintiff signed the contract under the erroneous belief that the defendants were making a substantial consideration of more property than she could hold under the law, the point we consider controlling renders it needless to determine whether there was sufficient consideration for her promise, but the question is important in its equitable relation to the right of rescission on the ground of a mistake of law. While the insufficiency of the evidence is argued generally and at considerable length by counsel for defendants, there seems to be no specific objection to the following finding of the court, and its verity may be reasonably inferred from the facts and circumstances of the case: "The plaintiff at the time was grief stricken, her husband having died within four days, and been buried within one day next prior to such meeting, and was in no condition mentally to attend to any important business, or to fully and clearly consider the nature or purport of such agreement." Regardless of a conflict of the testimony as to whether plaintiff was advised that she was entitled to one-third of her deceased husband's property it is quite apparent from all the evidence that neither Mr. Almond nor any of the parties to the action were familiar with the full import of the statute relating to the revocation of wills, nor did any one seem to understand that her only right in the homestead was to occupy the same until otherwise disposed of according to law, and that the minor son was entitled to one-half of the $750 exemptions. While mutual concessions in the way of compromise among members of

the same family are not usually disturbed for any mistake of law, there has constantly existed a forceful inclination to relieve a party who has, without substantial recompense, surrendered property unquestionably his own through a misconception as to the extent of his interest therein, and the courts have quite uniformly dealt with such mistakes as analogous to mistakes of fact.

In the course of an extended and characteristically able dissertation on the subject, Mr. Pomeroy says: "A person may be ignorant or mistaken as to his own antecedent existing legal rights, interests, duties, liabilities, or other relations, while he accurately understands the legal scope of a transaction into which he enters, and its legal effect upon his rights and liabilities. It will be found that the great majority, if not, indeed, all, of the well-considered decisions in which relief has been extended to mistakes pure and simple, fall within this class; and, also, that whenever cases of this kind have arisen, relief has almost always been granted, although not always on this ground. Courts have felt the imperative demands of justice, and have aided the mistaken parties, although they have often assigned as the reason for doing so, some inequitable conduct of the other party which they have inferred or assumed. The real reason for this judicial tendency is obvious, although it has not always been assigned." 2 Pom. Eq. Juris. p. 313. Apparently familiar with the fundamental principles of justice and that ignorance of the law may under certain circumstances be excused in equity, the Legislature of this state has formulated a statute by which relief is clearly obtainable from mistakes of law arising in a case like the one under consideration.

Under the law of this state apparent consent to a contract is not real or free when obtained through mistake, and mistakes of law are expressly brought within the meaning of its provisions when they arise from a similar misapprehension of the law by all parties, or a misapprehension of the law by one party of which the others are aware at the time of contracting, but which they do not rectify. Sections 1195, 1207, Rev. Civ. Code. A party to a contract may rescind the same "if the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake. * * * He must rescind promptly, upon discovering the facts which

entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind." Sections 1283, 1285, Rev. Civ. Code. Manifestly, plaintiff was mistaken as to a clear legal right which the defendants did not rectify, although they all appear to have understood from Mr. Almond that she was entitled to one-third of her deceased husband's property, and, in any event, the facts and circumstances disclosed by the record, call for the application of the foregoing statutory rule. Due diligence in ascertaining her rights and promptness in rescindind has prevented any change in the situation of the parties and, with the mistake corrected, their legal relations with reference to the property are wholly restored.

In the absence of any errors of law occurring at the trial, the judgment, annulling the contract, is affirmed for the reasons herein stated.

CORSON, J., not sitting.